1  **ZWERLING, SCHACHTER**
   **& ZWERLING, LLP**
2  41 Madison Ave.
   New York, NY 10010
3  Telephone: 212-223-3900
   E-mail: zsz.com
4  Robert S. Schachter, Esq.
   NY State Bar No. 1215813
5  Richard A. Speirs, Esq.
   NY State Bar No. 2049948
6  Kevin M. McGee, Esq.
   NY State Bar No. 2763852
7
   **PLATTNER VERDERAME PC**
8  P.O. Box 36570
   Phoenix, AZ 85067-6570
9  Telephone: 602-266-2002
   State Bar No. 00138600
10 E-mail: pvpc@plattner-verderame.com
   Frank Verderame, Esq.
11 State Bar No. 007519

12
   Attorneys for Plaintiffs
13
                    **IN THE UNITED STATES DISTRICT COURT**
14
                            **DISTRICT OF ARIZONA**
15

16                                      | **NO.**
   ANGELKO BOGDANOV, on behalf of       |
17 himself and all others similarly situated, |
                    Plaintiff,          | **CLASS ACTION COMPLAINT**
18                                      |
   v.                                   |
19                                      | (Jury Trial Demanded)
   SYNTAX-BRILLIAN CORP., VINCENT       |
20 SOLLITTO, JR., JAMES LI and WAYNE    |
   PRATT,                               |
21                                      |
                    Defendants.         |
22

23                    **CLASS ACTION COMPLAINT**
24
          Plaintiff, Angelko Bogdanov, individually and on behalf of all other persons
25
   similarly situated, by his undersigned attorneys, allege upon personal knowledge as to
26

himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the public documents and announcements made by the defendants, with the Securities and Exchange Commission ("SEC"), and press releases regarding Syntax-Brillian Corp. ("Syntax-Brillian" or the "Company") and a review of other publicly available information. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.     This is a class action brought by plaintiff on behalf of himself and a Class consisting of all other persons who purchased or otherwise acquired the securities of Syntax-Brillian during the period from February 9, 2007 through November 14, 2007, inclusive (the "Class Period") to recover damages caused by defendants' violation of the federal securities laws. The Company's common stock trades on the NASDAQ under the ticker symbol "BRLC." As of September 6, 2007, there were approximately 93 million shares of Syntax-Brillian common stock issued and outstanding.

2.     During the Class Period, Syntax-Brillian reported tremendous growth in revenues, net income and profitability, driven in large measure by its sales of LCD (Liquid Crystal Display) televisions in China. Throughout the Class Period, defendants repeatedly assured investors that the Company's sales growth and profitability were "outstanding," and that the Company's future "continues to look bright based on our

business model, low operating expense, and excellent strategic partnerships and channel relationships."

3.    These statements were materially false and misleading because Syntax-Brillian failed to disclose that while the Company shipped hundreds of thousands of LCD televisions to its sole distributor in China during the Class Period, and recorded hundreds of millions of dollars in revenue in connection with these shipments, the end-user demand for the Company's LCD televisions was much weaker than what investors were led to believe. The Company, in short, engaged in what is commonly known as "channel stuffing," which is the business practice where a company inflates its sales figures by forcing more products through a distribution channel than the channel is capable of selling to the world at large.

4.    On September 12, 2007, Syntax-Brillian issued a press release announcing its full year 2007 results for the quarter ended June 30, 2007. The Company's 2007 fiscal-year results matched analyst expectations, but the Company warned in the press release that the results for its first quarter 2008, ending on September 30, 2007, would be significantly below expectations. The Company now projected first quarter 2008 revenues of between $170-180 million, when analysts were expecting the Company to report revenues of $254 million, a shortfall of more than 25%. Syntax-Brillian stated that the current business outlook "reflects Sytnax-Brillian's decision to take a more cautious approach to sales in Asia." The Company also blamed a tighter credit environment in Asia for the revenue shortfall. Also on September 12, 2007, in a separate press release, the Company announced

the resignation of defendant Wayne Pratt ("Pratt"), who was the Company's Chief Financial Officer.

5.    The next day, Syntax-Brillian's common stock declined more than 33% to $4.01 on volume of more than 36 million shares.

6.    The Company's decision to ship more LCDs to China than end-user demand warranted did not become fully apparent until the Company reported its financial results for the first quarter of 2008 ended September 30, 2007. On November 11, 2007, the Company announced that revenues for the quarter was $150.6 million, a decline of 26.6% from the previous quarter, and that LCD revenue from China in the first quarter 2008 was $14.6 million, compared with $96.8 million in the prior quarter, a decline of approximately 85%.

7.    The Company also announced that it ended its exclusive relationship with its distributor in China, South China House of Technology ("SCHOT"), and that the Company would be licensing its "Olevia" brand name for sales in Asia to a third-party that would be responsible for the manufacture, marketing and selling of Olevia LCDs in Asia. In its first quarter 2008 Form 10-Q, filed with the SEC on November 15, 2007, the Company also indicated that SCHOT still owed the Company large sums of money for the LCDs shipped in prior quarters. As of September 30, 2007, SCHOT owed the Company $123.2 million, of which $98 million was more than 120 days past due as of November 08, 2007.

8.     On November 15, 2007, shares of Syntax-Brillian closed at $2.89, a decline of approximately 10% from the prior day's closing price.

## JURISDICTION AND VENUE

9.     The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j (b) and 78t (a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein occurred in substantial part in this District and the Company is headquartered in this District.

12.     In connection with the acts, transactions and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

13.     Plaintiff Angelko Bogdanov purchased Syntax-Brillian's securities during the Class Period, as evidenced by the attached certification, and has suffered damages.

14.     Defendant Syntax-Brillian designs, develops, and distributes high-definition televisions, and digital and film cameras.  The Company sells its televisions under the

Olevia brand name.  Syntax-Brillian is headquartered in Tempe, Arizona.

15.     Defendant Vincent F. Sollitto ("Sollitto") was the Chief Executive Officer and Chairman of the Board of Directors of Syntax-Brillian during the Class Period.  On October 1, 2007, the Company announced that Sollitto was being replaced by defendant James Li ("Li") as Chief Executive Officer and that Sollitto would retain his role of Executive Chairman of the Company's Board of Directors.

16.     Defendant Li was the President of Syntax-Brillian during the Class Period. On October 1, 2007, Li replaced Sollitto as the Company's Chief Executive Officer.

17.     Defendant Pratt was the Company's Chief Financial Officer during the Class Period.  On September 12, 2007, the Company announced Pratt's resignation.

18.     Defendants Sollitto, Li and Pratt (collectively, the "Individual Defendants"), by reason of their management positions, memberships on the Board, and ability to make public statements on behalf of Syntax-Brillian, were and are controlling persons, and had the power and influence to cause and did cause Syntax-Brillian to engage in the unlawful conduct complained of herein.

19.     By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information regarding the Company's revenues, account receivables, operating condition and future prospects, and attended management and/or Board meetings.  The Individual Defendants were responsible for the truthfulness and accuracy of the Company's public filings and press releases described herein.

20.     The Individual Defendants, as officers and directors of a publicly-held company, had a duty to disseminate promptly truthful and accurate information with respect to Syntax-Brillian, its financial condition and to correct any public filings or statements issued by or on behalf of the Company that had become false or misleading.

21.     The Individual Defendants knew or recklessly disregarded that the false and/or misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's securities and would cause the price of the Company's securities to become artificially inflated.   The Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

22.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  The Individual Defendants, because of their positions with Syntax-Brillian, are responsible for Syntax-Brillian's public filings and press releases, and are provided with copies of Syntax-Brillian's public filings and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants are responsible for the accuracy of the public filings and press releases detailed herein, and are therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

23.     The Company sells its LCD and HDTV (high definition televisions) televisions under the brand-name Olevia in the United States directly to retailers and

7

through distributors to consumer electronics retailers, such as Circuit City, CompUSA, Sears, Target, Amazon.com, and RadioShack.com. In Asia, during the Class Period, Syntax-Brillian sold its televisions exclusively through SCHOT, its sole Asian distributor.

24.     In fiscal year 2007 ended June 30, 2007, LCD television sales to SCHOT accounted for approximately 48% of the Company's total revenues. In fiscal year 2006, sales to SCHOT represented only 16% of the Company's total revenue and, in fiscal year 2005, SCHOT was not even a customer of the Company's. In the last two fiscal years, therefore, and throughout the Class Period, sales to SCHOT were a substantial factor in the Company's reported growth in revenues and profitability.

25.     The Company's reported revenues during the Class Period from sales to SCHOT were facilitated by the generous credit terms that the Company gave SCHOT. SCHOT received credit terms of net-120 days, meaning that SCHOT had 120 days, or approximately four months, to pay the Company for the products it received. During the Class Period, the Company's account receivables, or money that it was owed from customers, and days sales outstanding ("DSO"), which is the average age of its account receivables, increased substantially as a result of the generous credit terms offered to SCHOT. The Company manufactured and shipped hundreds of thousands of LCD televisions sets to SCHOT during the Class Period, and recorded these shipments as revenue but, because of the generous credit terms offered to SCHOT, never received the full amount of money it was owed from SCHOT.

8

**False and Misleading Statements During the Class Period**

26.     On February 8, 2007, Syntax-Brillian reported its results for the second fiscal quarter of 2007 for the quarter ended December 31, 2006 ("Second Quarter 2007"). For the quarter, Syntax-Brillian reported "record" revenue of $242.5 million, up 303% from the year-ago quarter. Net income for the quarter was $14.8 million compared with a net loss of $1.3 million for the second fiscal quarter of 2006. In announcing these results, Sollitto stated that "I am extremely pleased with the performance of our team this quarter. . . . Revenue and earnings hit new records as sell-through of the Olevia brand at the retail level continues to exceed our expectations and we expand distribution into new national channels."

27.     For the Second Quarter 2007, the Company reported account receivables of $123.5 million from SCHOT, with DSO at 89.3 days. In the prior quarter ended September 30, 2006, account receivables from SCHOT was $53.4 million. The account receivables owed to the Company from SCHOT increased by $70.1 million, or more than 130%, from the prior fiscal quarter. The increase in the Second Quarter 2007 account receivables due from SCHOT also represented approximately 29% of the Company's total revenue reported for the quarter.

28.     During the conference call with analysts immediately after issuing the Company's Second Quarter 2007 results, Pratt stated that "we are very pleased with the quarterly results." Pratt also raised the Company's guidance for fiscal year 2007 ending June 30, 2007, stating that revenue was expected to be in the range of $650-700 million and

that the Company planned to ship volumes of between 975,000 – 1,025,000 units.  Pratt attributed the Company's increase in guidance to the higher revenue reported in the December quarter as well as an increased outlook for the quarters ending in March and June.

29.    During the same conference call, Sollitto also touted the Company's "outstanding" Second Quarter 2007 results and assured investors that the Company's "future is very bright as we move forward."  On the issue of its account receivables to SCHOT, Sollitto assured investors that demand in China was strong and that "[t]he channel is so desperate to get Olevia product that they are paying early to ensure if they can maintain supply."

30.    On February 12, 2007, the Company filed its Form 10-Q with the SEC for the Second Quarter 2007, which was signed by Sollitto and Pratt and repeated the Company's previously announced financial results.   The 10-Q stated that "[t]he accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. . . . In our opinion, all adjustments, which include only normal recurring adjustments, necessary to present fairly the financial position, results of operations, and cash flows for all periods presented have been made."

31.    In the Second Quarter 2007 10-Q, the Company also indicated that for the first six months of fiscal year 2007 ended December 31, 2006, the Company's cash flow from operations was a negative $46.5 million.  The Company stated that "[t]he operating cash

outflow during the six months ended December 31, 2006 was primarily the result of increases in account receivables and inventories. . ." The Company assured investors, however, that "[w]e believe that the cash from operations and the increased credit facilities will be sufficient to sustain operations at the current level for the next 12 months." The Company reported $83.8 million owed and outstanding under its various credit facilities as of December 31, 2006.

32.    The Company's Second Quarter 2007 Form 10-Q also contained certifications signed by Sollitto and Pratt that stated, in part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

33.    On March 28, 2007, Syntax-Brillian announced that it sold approximately 2.1 million shares of common stock at $7.32 per share and warrants to purchase 211,817 shares of common stock at an exercise price of $8.78 per share, for proceeds of approximately $15.5 million. The purchasers of the Company's common stock and warrants were affiliated with two of the Company's suppliers, WesTech Electronics Ltd. and TCV Group.

34.    On May 10, 2007, Syntax-Brillian reported its results for the third fiscal quarter of 2007 for the quarter ended March 31, 2007 ("Third Quarter 2007"). For the quarter, Syntax-Brillian reported "record" revenue of $162.9 million, up 257% from the year-ago quarter. Net income for the quarter was $5.5 million compared with a net loss of $13.4 million for the third fiscal quarter of 2006. In announcing these results, Sollitto stated that "I am extremely pleased with the results this quarter. . . . our revenue outlook for the

full calendar year has now been increased to a range of $975 million to $1.1 billion."

35.    For the Third Quarter 2007, the Company reported account receivables of $170.8 million from SCHOT.  The account receivables owed to the Company from SCHOT increased by $47.3 million from the prior fiscal quarter.  In the Third Quarter 2007, sales to SCHOT accounted for 39% of the Company's total revenue.

36.    During the conference call with analysts immediately after issuing the Company's Third Quarter 2007 results, Pratt informed investors that of the amount outstanding from SCHOT as of March 31, 2007, $47.2 million was beyond the 120 day terms granted on these sales.  He also stated that since the end of the quarter, SCHOT had fallen further behind in its payments to the Company.  Nonetheless, Pratt assured investors that SCHOT's late payments were caused by "seasonal payment delays," and that SCHOT would soon be in compliance with the 120 day terms granted.  He stated that:

> As of May 9, approximately $69 million if invoices from SCHOT are past due and our total outstanding receivable balance from SCHOT was down to a $133.2 million.  The delay in collections from SCHOT is driven by seasonal payment delays from SCHOT's China retailers.  In the past two weeks the rate of payment has increased significantly.

37.    During the same conference call, in response to a question concerning the Company's DSO of 122 days, Sollitto also sought to assure investors that the Company's difficulties in receiving payments from SCHOT were largely in the past.  He stated that "we are already at the back end of the issue because we are starting to receive now payments, substantial payments every day from those China receivables."  Later in the conference call, he told investors that sales to China is growing at "75% year-over-year," and that the

Company's prospects in China represent a business opportunity that's at least "two to three times larger than it was last year."

38.     On May 11, 2007, the Company filed its Form 10-Q with the SEC for the Third Quarter 2007, which was signed by Sollitto and Pratt and repeated the Company's previously announced financial results.   The 10-Q stated that "[t]he accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. . . . In our opinion, all adjustments, which include only normal recurring adjustments, necessary to present fairly the financial position, results of operations, and cash flows for all periods presented have been made."

39.     In the Third Quarter 2007 10-Q, the Company also indicated that for the nine months of fiscal year 2007 ended March 31, 2007, the Company's cash flow from operations was a negative $58.3 million.   The Company stated that "[t]he operating cash outflow during the nine months ended March 31, 2007 was primarily the result of increases in account receivables and inventories. . ."   The Company further stated that "[t]he large increase in account receivables in the nine months ended March 31, 2007 was primarily a result of the significant increase in net sales to our Asian distributor during the quarters ended December 31, 2006 and March 31, 2007."

40.     In the Third Quarter 2007 Form 10-Q, the Company reported $73.9 million owed and outstanding under its various credit facilities as of March 31, 2007, and the

Company "did not have any unused availability under our credit facilities" as of that date.

41.     The Company's Third Quarter 2007 Form 10-Q also contained certifications signed by Sollitto and Pratt that stated, in part, that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

42.     On May 23, 2007, the Company announced the pricing of a public offering of approximately 25.6 million shares of its common stock at $5.75 per share. In the offering, the Company intended to sell 23 million shares for gross proceeds of approximately $124.6 million; the other selling shareholders expected to reap proceeds of approximately $14.1 million.

43.     On or about May 24, 2007, the Company filed a Prospectus with the SEC in connection with its 25.6 million share stock offering.  In the Prospectus, the Company highlighted the growing importance of sales to SCHOT to the Company's reported growth in revenues and profitability during the Class Period. The Prospectus stated that "[n]et sales in Asia [SCHOT] totaled $249.5 million, or 50.7% of total net sales, for the first three quarters of fiscal 2007 compared with $12.9 million, or 9.7% of total net sales, for the first three quarters of fiscal 2006."  The Prospectus also incorporated by reference the Company's Form 10-Qs for the Second and Third Quarter 2007.

44.     On July 16, 2007, the Company issued a press release affirming its revenue and gross margin guidance for the fourth quarter 2007 ended June 30, 2007.  Pratt was quoted in the press release as stating that because, in part, of "strong demand for our

products," Syntax-Brillian was raising its "revenue outlook for the calendar year ending December 31, 2007 from our previous range of $950 to $1.1 billion to a revised range of $1.1 billion to $1.3 billion." Syntax-Brillian also reported that it received $129.6 million from SCHOT and that its Asia distributor no longer had invoices longer than 120 days.

45.     On August 23, 2007, the Company announced that it raised approximately $20 million through the sale of approximately 3.1 million shares at $6.485 per share to TECO Electric & Machinery Co. ("TECO"), which is a supplier to the Company and based in Taiwan. As part of this stock transaction, Syntax-Brillian, TECO and Taiwan Kolin Co., Ltd. ("Kolin"), a major supplier to, and shareholder of, the Company, entered into a three-way alliance wherein Kolin would oversee the supply-chain management and product development platform of various TECO branded products for distribution in Taiwan as well as other regions of the world that all three companies agree to enter. TECO will also provide supply-chain financing of up to $100 million for the purchase of key components in support of Olevia branded LCD TVs.

**The Company Drastically Cuts its Revenue and Earnings Forecast**

46.     After the market closed on September 12, 2007, Syntax-Brillian reported its results for the year-end and fiscal fourth quarter 2007 ended June 30, 2007 ("Fourth Quarter 2007"). Revenue for the Fourth Quarter 2007 was $205.3 million and net income was $8.4 million, which met expectations.

47.     For the Fourth Quarter 2007, account receivables from SCHOT was $138.1 million, with none of the receivables past due 120 days. The Company also had $78.1

million outstanding under its credit line as of June 30, 2007 which, according to a statement made by Pratt in the follow-up conference call, was "virtually all of [Syntax-Brillian's] borrowing base capacity."

48.     For the first quarter 2008 ending September 30, 2007, the Company projected revenue of $170 - $180 million, which was significantly below the Company's prior projection of revenues of $254 million. The Company also projected revenues for calendar year 2007 of $1.0 to $1.1 billion, which was also significantly below the Company's previous guidance given just two months earlier. For the first quarter, the Company also projected shipments of LCD televisions of between 270 to 290,000 units.

49.     In the press release, Syntax-Brillian stated that the current business outlook "reflects Sytnax-Brillian's decision to take a more cautious approach to sales in Asia." The Company also blamed a tighter credit environment in Asia for the revenue shortfall. During a conference call with analysts the same day, Sollitto stated that the Company was scaling back on shipments to China.

50.     Despite the Company's substantial reduction in projected revenues for the first quarter of 2008, which was set to close in less than three weeks, Sollitto was still very positive concerning the Company's sales in China. On the conference call, Sollitto stated that "[d]emand for Olevia in China is extremely high and as you know we've enjoyed very good margins there." He also stated that the Company was still "modeling to grow at just under 100%" in China through the December quarter.

51.     Also on September 12, 2007, in a separate press release, the Company announced the resignation of Pratt.  The Company announced that Pratt had accepted a position at a start-up company in Tempe, Arizona and expected to relinquish his responsibilities at the Company by the end of September.

52.     The next day, Syntax-Brillian's common stock declined more than 33% to $4.01 on volume of more than 36 million shares.

53.     On October 1, 2007, Syntax-Brillian announced that Sollitto was replaced as Chief Executive Officer by Li, who also retained his title as President of the Company. Syntax-Brillian also announced that Sollitto would remain as Executive Chairman of the Company's Board.

54.     On October 9, 2007, Syntax-Brillian announced a comprehensive "120-day action plan" by the Company's management and Board.  According to the press release, key elements of the plan include, among other things, evaluating how the Company does business in China with a focus on quality of earnings, evaluating the Company's corporate infrastructure and processes with the aim of reducing costs, optimizing allocation of assets, and improving productivity, profits, and overall performance; and focus on meeting any additional near-term capital needs with debt instruments.

55.     On October 30, 2007, Syntax-Brillian announced that it has secured a five-year $250 million senior secured credit facility arranged by Silver Point Finance.  The facility will be used to repay and extinguish approximately $80 million drawn against existing credit facilities, purchase LCD panels and for general corporate and working capital

purposes.   Li stated that the credit facility can also be used to finance up to 85% of North American inventory and account receivables, up to 25% of account receivables from SCHOT.   Interest on the credit facility will be paid at an annual rate equal to, at the Company's option, LIBOR plus 6% or Prime plus 5%. Silver Point Finance will receive ten-year warrants exercisable into approximately 5.28 million shares of common stock at an exercise price of $0.01 per share.

**The Truth is Revealed**

56.    On November 8, 2007, Syntax-Brillian announced its results for the first fiscal quarter of 2008 for the period ended September 30, 2007 ("First Quarter 2008"). The results were significantly worse than what had even been projected by the Company on September 12, 2007, when there was less than three weeks left in the quarter.   Revenues were $150.6 million, significantly below the $170-180 million that had been projected in September, and LCD sales in China were $14.6 million, a decline of approximately 85% from the Fourth Quarter 2007.   Moreover, the Company shipped only 240,000 units in the First Quarter 2008, which was also substantially below the Company's projected guidance given on September 12th of 270-290,000 units.

57.    Syntax-Brillian also announced, for the first time, that it had ended its exclusive distributor agreement with SCHOT.   Rather than manufacturing and shipping televisions directly to SCHOT, and immediately recording the revenue, Syntx-Brillian announced that it would now license the "Olevia" brand in Asia to a third-party, Olevia Far East.  Olevia Far East would be responsible for all aspects of selling the televisions

in Asia – manufacturing, marketing and selling – and Syntax-Brillian would just receive a fee for each television sold.

58.    Syntax Brillian announced that it had shipped $56.1 million in product to Olevia Far East during the First Quarter 2008 but, because these shipments did not conform with the appropriate accounting standards for revenue recognition, specifically Staff Accounting Bulletin 104, and due to lack of collection history and credit worthiness with Olevia Far East, the Company deferred revenue recognition until payments are received.

59.    In the First Quarter 2008, Syntax-Brillian also made little progress in collecting payments on televisions shipped to SCHOT during the prior fiscal quarters. Despite the fact that the Company ended shipments of LCDs to SCHOT altogether in the First Quarter 2008, account receivables owed from SCHOT was $123.2 million as of September 30, 2007, which was only $14.9 million less than the $138.1 million that SCHOT owed the Company as of June 30, 2007.

60.    On November 15, 2007, before the market opened, Syntax-Brillian filed its Form 10-Q for the First Quarter 2008. In the Form 10-Q, the Company revealed that, of the $123.2 million owed to the Company by SCHOT, $98 million of that was more than 120 days past due as of November 8, 2007. The Company also indicated in the Form 10-Q that its Chief Accounting Officer left the Company in October 2007.

61.    On November 15, 2007, shares of Syntax-Brillian closed at $2.89, a decline of approximately 10% from the prior day's closing price.

## LOSS CAUSATION/ECONOMIC LOSS

62.     During the Class Period, defendants engaged in a course of conduct that artificially inflated the Company's securities and operated as a fraud and deceit on purchasers of Syntax-Brillian securities.  The prices of Syntax-Brillian common stock fell when the misrepresentations made to the investing community, including the disclosure of materially false and misleading financial statements were finally disclosed to investors.  As a result, plaintiff and other members of the Class suffered damages.

63.     The false claims concerning Syntax-Brillian's financial statements and operating results caused and maintained the artificial inflation in Syntax-Brillian's stock price throughout the Class Period and until the truth was disclosed to the market.

64.     Defendants' false and misleading statements had the intended effect and caused Syntax-Brillian's common shares to trade at artificially inflated levels throughout the Class Period, trading as high as $ 6.60 per share.

65.     On September 12, 2007, Syntax-Brillian significantly lowered its revenue guidance for the first quarter 2008 ending September 30, 2007, and calendar year 2007.  For the first quarter 2008, the Company projected revenue of $170 - $180 million, which was significantly below the Company's prior revenue projection of $254 million.  The Company also projected revenues for calendar year 2007 of $1.0 to $1.1 billion, which was also significantly below the Company's previous guidance given just two months earlier.  According to the Company, the lower revenue guidance was caused by, among other reasons, a more cautious approach to sales in Asia. The next day, Syntax-Brillian's stock

dropped $1.87 or 37%, to close at $3.14.

66.     On November 15, 2007, Syntax-Brillian announced that $98 million owed to the Company from SCHOT, out of $123.2 million in total, was more than 120 days past due as of November 8, 2007, and that the Company's Chief Accounting Officer left the Company in October 2007.  On this news, the Company's shares declined 10% to close at $2.89 on November 15, 2007.

## FRAUD ON THE MARKET ALLEGATIONS

67.     The market for Syntax-Brillian securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Syntax-Brillian securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Syntax-Brillian securities relying upon the integrity of the market price of Syntax-Brillian securities and market information relating to Syntax-Brillian, and have been damaged thereby.

68.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Syntax-Brillian securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

69.     The statements detailed in ¶¶ 26, 28, 29, 30, 32, 34, 36, 37, 38, 41, 44, 48, and 50, above, concerning the Company's revenues, profitability and demand for its products in China, were materially false and misleading, because among other things:  (a) the Company "channel stuffed" thousands of LCD televisions to SCHOT, without sufficient end-user demand, to increase artificially the Company's reported revenues and net income; (b) the Company's failure to meet first and second quarter 2008 revenue and earnings guidance was not the result of a credit contraction in Asia, but rather was the result of too many unsold televisions held by SCHOT and a lack of real consumer demand for Olevia televisions in China; (c) the Company's negative working capital and cash flow were caused by SCHOT's failure to pay for televisions that it received but was unable to sell; and d) the Company's cash from operations and credit facilities were not sufficient to sustain operations for the next twelve months, absent several offerings of the Company's common stock, including the issuance of warrants to purchase 5.28 million shares at $0.01 per share in order to secure a new $250 million credit facility from Silver Point Finance.

70.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Syntax-Brillian's business, accounting and financial results.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Syntax-Brillian and its

business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### SCIENTER

71.     Defendants acted with *scienter* in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance of dissemination of such statements or documents in primary violations of the federal securities laws.   As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Syntax-Brillian, their control over and/or receipt and/or modification of Syntax-Brillian's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Syntax-Brillian, participated in the fraudulent scheme alleged herein.

72.     Because of their executive and managerial positions with Syntax-Brillian, the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of Syntax-Brillian particularized herein *via* access to internal corporate documents, conversations or connections with

corporate officers or employees, attendance at management meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

73.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to Syntax-Brillian's operations and financial condition or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading to the market.  As a result of their failure to do so, the price of Syntax-Brillian's common stock was artificially inflated during the Class Period, damaging plaintiff and the Class.

74.    The Individual Defendants, because of their positions with Syntax-Brillian, controlled the contents of the quarterly reports, annual reports and press releases disseminated throughout the Class Period.  Each Individual Defendant was provided with or had access to copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Syntax-Brillian's corporate releases detailed herein and is therefore responsible and liable for the representations contained therein.

75.    Each defendant is liable as a primary violator in making false and misleading

statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Syntax-Brillian securities during the Class Period.

76.     Defendants acted with *scienter* in that each defendant knew or recklessly disregarded that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statement or documents as primary violators of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Syntax-Brillian and it business practices, their control over and/or receipt of Syntax-Brillian's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Syntax-Brillian, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetuated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

77.     Defendants engaged in this scheme to complete three separate offerings of common stock during the Class Period:

(a)   on March 28, 2007, Syntax-Brillian sold approximately 2.1 million shares of

common stock at $7.32 per share and three-year warrants to purchase 211,817 shares of common stock at an exercise price of $8.78 per share, for proceeds of approximately $15.5 million;

(b) on May 23, 2007, the Company announced the public offering of approximately 25.6 million shares of its common stock at $5.75 per share, of which the Company sold 23 million shares; and,

(c) on August 23, 2007, the Company sold approximately 3.1 million shares at $6.485 per share to TECO.

78.     These offerings raised approximately $155 million for the Company and, but for defendants' fraud as alleged herein, the Company would not have been to complete these offerings at all or, if completed, not at the prices at which the securities were sold.

## CLASS ACTION ALLEGATIONS

79.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the securities of Syntax-Brillian during the Class Period. Excluded are defendants, any entity in which defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of defendants.

80.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this

time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members of the Class.

81.    Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the Company issued false and misleading financial statements during the Class Period;

(c)    whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(d)    whether the market prices of the Company's securities during the Class Period were artificially inflated because of defendants' conduct complained of herein;  and

(e)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.    Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

85.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that:

(a)     defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     such omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market and their prices were inflated artificially during the Class Period because of defendants' misrepresentations and omissions detailed herein;

(d)     the misrepresentations and omissions alleged induced a reasonable investor to misjudge the value of the Company's securities; and

(e)     plaintiff and the other members of the Class purchased Syntax-Brillian securities between the time defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

86.    Based upon the factors set forth in the preceding paragraph, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO STATUTORY SAFE HARBOR

87.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements nor were they identified as "forward-looking statements" when made.  Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward looking statements.  In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, defendants are liable for those false forward-looking statements because at the time each of those statements was made the speaker knew those forward-looking statements were false and/or the statement was authorized and/or approved by an executive officer of Syntax-Brillian who knew that the statements were false when made.

**COUNT I**

**(VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND
RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS)**

88.    Plaintiff repeats and reiterates each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.    During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including plaintiff and the other members of the Class, and to induce plaintiff and the other members of the Class to purchase Syntax-Brillian securities during the Class Period at artificially inflated prices.

90.    During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and/or issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

91.    As a result of defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of Syntax-Brillian's securities

were artificially inflated during the Class Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendants, plaintiff and the other members of the Class who purchased Syntax-Brillian securities on the open market, relied, to their detriment, on the integrity of the market price of the stock in purchasing Syntax-Brillian's securities.

92.   Had plaintiff and the other members of the Class known the truth, they would not have purchased Syntax-Brillian shares or would not have purchased them at the inflated prices that they did.

93.   Plaintiff and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proved at trial.

94.   By reason the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to plaintiff and the other members of the Class for damages that they suffered in connection with their purchases of Syntax-Brillian stock during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### BROUGHT AGAINST THE INDIVIDUAL DEFENDANTS

95.   Plaintiff repeats and reiterates each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

96.   The Individual Defendants acted as controlling persons of the Company under the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and active participation in and/or awareness of the Company's day-to-day

operations, and/or intimate knowledge of the Company's business plans and implementation thereof, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff alleges are false and misleading.  The Individual Defendants were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

97.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

98.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)    Such other relief as this Court deems appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED this day of 13th day of December, 2007.

PLATTNER VERDERAME PC

By_____
    Frank Verderame
    P.O. Box 36570
    Phoenix, AZ 85067-6570

ZWERLING, SCHACHTER
& ZWERLING, LLP
Robert S. Schachter
Richard A. Speirs
Kevin M. McGee
41 Madison Avenue-32[nd] Floor
New York, NY 10010
Tel.: (212) 223-3900
Fax: (212) 371-5969

*Attorneys for Plaintiff*

34